Filed 12/15/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SOUTHERN CALIFORNIA GAS LEAK CASES | B283606 |
| _____ | (JCCP No. 4861) |
| SOUTHERN CALIFORNIA GAS COMPANY, | |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| FIRST AMERICAN WHOLESALE LENDING CORPORATION et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate. John Shepard Wiley, Jr., Judge.  Petition granted.

Morgan, Lewis & Bockius, James J. Dragna, David L. Schrader, Yarden A. Zwang-Weissman, for Petitioner.

No appearance for Respondent.

Baron & Budd and Roland Tellis; Boucher and Raymond P. Boucher; Lieff Cabraser Heimann & Bernstein and Robert J. Nelson, for Real Parties in Interest.

_____

Seven businesses (business plaintiffs) filed suit to recover damages for purely economic loss resulting from a massive natural gas leak at a Southern California Gas Company (SoCalGas) facility; they did not claim any injury to person or property. Although our Supreme Court long ago recognized plaintiffs may sue in negligence for economic loss alone (*Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*), such recovery has been limited to situations where a transaction between the defendant and another was intended to directly affect the plaintiff (a third party), whose economic loss was a foreseeable consequence of the defendant's negligence. As business plaintiffs' complaint lacked allegations of personal injury, property damage, or the requisite transaction, SoCalGas filed a demurrer to the causes of action based on negligence.[1]

Concluding there is some uncertainty in the law, respondent court held SoCalGas should "bear all costs its accident caused" and there is no bar to recovery for purely economic loss under negligence theories when the precipitating event is a mass tort. The demurrer was overruled and SoCalGas

_____

[1] SoCalGas did not challenge the sufficiency of business plaintiffs' cause of action for violations of California's Unfair Competition Law. (Bus. & Prof. Code, § 17200 et seq. (UCL).)

petitioned for extraordinary relief. We conclude as a matter of law SoCalGas did not owe a duty to prevent business plaintiffs' economic loss based on negligent conduct. Accordingly, we grant the petition for a peremptory writ of mandate.

FACTUAL AND PROCEDURAL BACKGROUND[2]

On October 23, 2015, SoCalGas discovered a natural gas leak at its Aliso Canyon Storage Facility (facility), located above Porter Ranch in Los Angeles. The gas leak spread an oily mist over nearby neighborhoods, damaging real and personal property. Residents and individuals who worked in the vicinity of the facility complained about odors and acute respiratory and central nervous system symptoms.

On November 19, 2015, in response to the complaints, the Los Angeles County Department of Public Health (Department) directed SoCalGas to offer temporary relocation to anyone living within a five-mile radius of the facility. The following month, the Los Angeles County Board of Education relocated students and staff at two Porter Ranch schools for the duration of the 2015-2016 school year.

On February 18, 2016, state officials confirmed SoCalGas permanently sealed the leak. On May 13, 2016, the Department issued a directive to SoCalGas to implement immediately a comprehensive remediation protocol for residences within a five-mile radius of the facility. Since October 2015, homeowners and

---

[2] We rely on the operative pleading—the second amended consolidated master class action business complaint—for our recitation of the facts. At this stage, we accept as true all properly pleaded facts. (*Lin v. Coronado* (2014) 232 Cal.App.4th 696, 700-701 (*Lin*).)

3

realtors have been obligated to disclose to potential homebuyers and lessees the events related to the gas leak.

The gas leak and the resulting relocation of approximately 15,000 Porter Ranch residents took an enormous toll on the local economy. On behalf of businesses located within a five-mile radius of the leak, seven named plaintiffs[3] initiated a putative class action against SoCalGas for (1) strict liability for ultrahazardous activity, (2) negligence, (3) negligent interference with prospective economic advantage, and (4) violations of the UCL.[4] Business plaintiffs claimed no injury to person or property. Instead, they alleged the gas leak and subsequent relocation of Porter Ranch residents caused crushing economic loss to their businesses.

SoCalGas filed a demurrer, asserting it owed no duty of care to business plaintiffs under any of the alleged negligence theories—strict liability, negligence, and negligent interference with prospective economic advantage. Relying on *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 804 (*J'Aire*), SoCalGas's principal argument was the pleading fell short because it did not include allegations of a transaction, as required by Supreme Court authority, to establish a special relationship sufficient to impose

---

[3] Named plaintiffs are First American Wholesale Lending Corporation dba First American Realty; GKM Enterprises, Inc. dba Hooper Camera and Imaging Centers; Genuine Oil Company dba Arco; SoCal Hoops Basketball Academy Corporation; King Taekwondo, Inc.; Polonsky Family Day Care aka Granada Childcare; and Babak Kosari, DPM, Inc.

[4] The action was coordinated with other lawsuits arising out of the gas leak in Judicial Council Coordinated Proceeding (JCCP) No. 4861. (Code Civ. Proc., § 404 et seq.)

4

a duty on SoCalGas.  Business plaintiffs opposed the demurrer, asserting *J'Aire* did not apply or, to the extent that authority did apply, they sufficiently pleaded the existence of a *J'Aire* "special relationship."

Respondent court advised the parties its tentative decision was to overrule the demurrer.  In a comprehensive discussion, the court concluded SoCalGas owed a duty to business plaintiffs and they could proceed with their action:  "The economic loss rule thus does not apply in a context like this one:  a classic mass tort action where high transactions costs precluded transactions, where the risk of harm was foreseeable and was closely connected with [SoCalGas's] conduct, where damages were not wholly speculative, and where the injury was not part of the plaintiff's ordinary business risk.  (*J'Aire . . . , supra*, 24 Cal.3d [at p.] 808.)"  After the hearing, respondent court adopted the tentative ruling as its decision.

Respondent court certified the ruling for appellate review.  (Code Civ. Proc., § 166.1.)  SoCalGas petitioned for a writ of mandate in this court and business plaintiffs filed a preliminary opposition.  We issued an alternative writ directing respondent court to vacate its order overruling the demurrer or to show cause before this court why the relief sought in the petition should not be granted.  The respondent court elected not to comply with the alternative writ.  Business plaintiffs subsequently filed a return and SoCalGas filed a reply.

## DISCUSSION

### I.    Review by Extraordinary Writ

Despite respondent court's certification of its ruling for immediate appellate review and business plaintiffs' decision not

to seek leave to further amend their pleading, the dissent urges this court to follow the general rule and deny writ relief on the basis SoCalGas has an adequate remedy by way of appeal should it fail to succeed on the merits. (See, e.g., *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 913 (*San Diego Gas*.) However, *San Diego Gas* articulated three exceptions to the general rule: (1) "when the demurrer raises an important question of subject-matter jurisdiction"; (2) when granting writ relief "will prevent 'needless and expensive trial and reversal'"; and (3) "when the issue presented is 'of widespread interest.'" (*Ibid.*; *id* at p. 913, fn. 17; see also *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747 (*City of Stockton*) [extraordinary writ relief where "[a] significant legal issue is presented, and the benefits of [a] defense would be effectively lost if defendants were forced to go to trial"].)

This case falls within the latter two recognized *San Diego Gas* exceptions. The legal issue here—the existence of a duty of care—is significant and of widespread interest. Resolution of the duty issue as to business plaintiffs at this stage also will prevent expensive and time-consuming litigation. Although the demurrer did not attack the UCL cause of action, it was directed to all causes of action where business plaintiffs would have the right to a jury trial and damages would be the primary remedy. In this regard, the conclusion by business plaintiffs that there is "a question of pleading that requires further factual development before it can be properly reviewed" rings hollow. Business plaintiffs failed to suggest any facts that need to—or even could— be further developed.

6

## II. Standard of Review

Extraordinary writ review of an order overruling a demurrer is governed by "the ordinary standards of demurrer review . . . ." (*City of Stockton, supra,* 42 Cal.4th at p. 747.) We independently review the complaint and all matters we are entitled to judicially notice to determine "whether, as a matter of law, the complaint states facts sufficient to state a cause of action. [Citations.] We view a demurrer as admitting all material facts properly pleaded but not contentions, deductions, or conclusions of fact or law." (*Lin, supra,* 232 Cal.App.4th at pp. 700-701.) If the complaint is insufficient, but there "is a reasonable possibility that the defect can be cured by amendment," plaintiff is entitled to have the opportunity to amend. (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010 (*Centinela*), internal quotation marks omitted.)

## III. Duty to Protect Third Parties From Purely Economic Loss in a Negligence Action

### A. Applicable Law

The existence of a duty to use due care is "[t]he threshold element of a cause of action for negligence." (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 (*Bily*); see also *Centinela, supra,* 1 Cal.5th at p. 1012.) Generally, a defendant owes no duty to prevent purely economic loss to third parties under any negligence theory. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 58 (*Quelimane*) ["Recognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law. Privity of contract is no longer

7

necessary . . . [but] public policy may dictate the existence of a duty to third parties"].) As the Supreme Court reaffirmed in *Centinela,* "[t]he test for determining the existence of such an exceptional duty to third parties is set forth in the seminal case of *Biakanja, supra,* 49 Cal.2d at page 650, as follows: 'The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.'" (*Centinela, supra,* 1 Cal.5th at pp. 1013-1014.)

The duty analysis in cases where a defendant's alleged negligence has resulted in economic loss in conjunction with personal injury or property damage involves many of the *Biakanja* factors. (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*); *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*).)[5] As is readily apparent, the duty analysis

---

[5] The Supreme Court decided *Rowland* 10 years after *Biakanja.* The *Rowland* duty factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost,

8

under *Rowland* does not include the first *Biakanja* factor, "the extent to which the transaction was intended to affect the plaintiff." Aside from that distinction, it bears emphasis at this point that the analytical perspectives are also different. Where alleged negligence has caused personal injury or property damage and economic loss, the existence of a duty of care is the rule, not the exception. (Civ. Code, § 1714; *Elam v. College Park Hospital* (1982) 132 Cal.App.3d 332, 339 ["'Duty' is thus presumed . . ."].) And under these circumstances, where a duty of care is presumed, courts consider the *Cabral/Rowland* factors to determine whether "an exception to the general duty rule in Civil Code section 1714" should be found. (*Lichtman v. Siemans Industry Inc.* (2017) 16 Cal.App.5th 914, 921.)

Where the alleged negligence has caused economic loss, but no personal injury or property damage, duty is not presumed. Rather, courts examine the *Biakanja* factors to determine whether to impose on the defendant "an exceptional duty to third parties." (*Centinela, supra,* 1 Cal.5th at p. 1013.)

*Biakanja* was the first in a consistent line of Supreme Court decisions discussing this "exceptional duty." In *Biakanja,* a notary public's negligent failure to properly attest a will deprived the intended beneficiary of the bulk of the decedent's estate. Although there was no privity between the intended beneficiary and the notary, the Supreme Court recognized the economic damage to the plaintiff was foreseeable and concluded the notary owed the beneficiary a duty of care. (*Biakanja, supra,* 49 Cal.2d at p. 651.)

---

and prevalence of insurance for the risk involved." (*Rowland, supra,* 69 Cal.2d at p. 113.)

The result was similar in *J'Aire,* where foreseeability of harm to the plaintiff as a result of the defendant's conduct again figured prominently in the analysis. The landlord in *J'Aire* hired a contractor to renovate commercial space, requiring the tenant to close its business during construction. The contractor's alleged negligence delayed completion of the project, thereby delaying the tenant's reopening. The Supreme Court permitted the tenant to sue the contractor on a negligence theory for the tenant's purely economic losses. The defendant could not perform the contract without interrupting the tenant's business. Therefore, it was foreseeable the contractor's performance would directly affect the tenant. (*J'Aire, supra,* 24 Cal.3d at pp. 804-805.)

In *J'Aire,* our Supreme Court explained that damages for lost earnings or profits have long been a staple of recovery in negligence actions where the plaintiff also suffers personal injuries or property damage. (*J'Aire, supra,* 24 Cal.3d at p. 804.) *J'Aire* also made it clear an award of damages for injury to prospective economic advantage without personal injury or property damage is "not foreclosed[:] Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." (*Ibid.*)

When a plaintiff seeks to recover for injury to prospective economic advantage without personal injury or property damage, *J'Aire* explained courts resolve the duty issue "by applying the criteria set forth in" *Biakanja.* (*J'Aire, supra*, 24 Cal.3d at p. 804.) Significantly, the *J'Aire* court did not presume the existence of a duty under Civil Code section 1714 or analyze the

10

duty question with reference to *Rowland*. (*J'Aire, supra*, 24 Cal.3d at pp. 804-805.)

*J'Aire* did cite Civil Code section 1714, but in the context of acknowledging that its duty conclusion was "consistent with . . . the basic principle of tort liability, embodied in Civil Code section 1714 . . . ." (*J'Aire, supra,* 24 Cal.3d at p. 806.) In the footnote appended to this statement, the Court added that Civil Code section 1714 "does not distinguish among injuries to one's person, one's property or one's financial interests. Damages for loss of profits or earnings are recoverable where they result from an injury to one's person or property caused by another's negligence. Recovery for injury to one's economic interests, where it is the foreseeable result of another's want of ordinary care, should not be foreclosed simply because it is the only injury that occurs." (*Id.* at p. 806, fn. 3.)

In sum, *J'Aire* recognized and preserved the distinction between presuming duty under Civil Code section 1714 and *Rowland* and not foreclosing duty for purely economic loss under *Biakanja*.

The plaintiffs in *Bily* lost their investments in a company. They sued the company's auditors for purely economic losses. The *Bily* majority never mentioned *Rowland*. It noted the absence of privity was not an analytical impediment and immediately recited the *Biakanja* factors.[6] (*Bily, supra,* 3 Cal.4th at p. 397.) The majority examined only the foreseeability

---

[6] The *Bily* dissent, on the other hand, did not mention *Biakanja.* The dissenting justices instead relied on the general duty rule in *Rowland* and concluded there was no justification to exempt the *Bily* auditors from it. (*Bily, supra,* 3 Cal.4th at pp. 419-420 (dis. opn. of Kennard, J.).)

element, however, and concluded the mere presence of a foreseeable risk of injury to third persons, was not "sufficient, standing alone, to impose liability for negligent conduct." (*Id*. at p. 399.) In arriving at this conclusion, the five-justice majority held: "Even when foreseeability was present, we have on several recent occasions declined to allow recovery on a negligence theory when damage awards threatened to impose liability out of proportion to fault or to promote virtually unlimited responsibility for intangible injury." (*Id*. at p. 398.) The majority then observed, "An award of damages for pure economic loss suffered by third parties raises the spectre of vast numbers of suits and limitless financial exposure" (*id*. at p. 400)[7] and provided the following example: "One frequently used illustration of the need to limit liability for economic loss assumes a defendant negligently causes an automobile accident that blocks a major traffic artery such as a bridge or tunnel. Although defendant would be liable for personal injuries and property

---

[7] Contrary to business plaintiffs' argument, application of the economic loss doctrine is not limited to the product liability arena: "'Judicial hostility to the use of tort theory to recover purely economic losses predates the twentieth-century battle over product liability. This hostility was motivated primarily by the fear of mass litigation and the concern that traditional tort concepts were not capable of providing clear limitations on potentially limitless liability. Defining the scope of tort duty to include only physical harm created "built-in" limits on liability, since any given chain of events in the physical world has finite consequences. Permitting plaintiffs to recover for purely economic losses would result in open-ended liability, since it is virtually impossible to predict the economic consequences of a given act.'" (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 777, fn. omitted.)

damage suffered in such an accident, it is doubtful any court would allow recovery by the myriad of third parties who might claim economic losses because the bridge or tunnel was impassible." (*Bily, supra,* at p. 400, fn. 11.)

The trend continued in *Quelimane* and *Centinela.* In discussing negligence theories, neither opinion mentioned Civil Code section 1714 or *Rowland.* (Compare, *Cabral, supra,* 51 Cal.4th 764.) Neither *Quelimane* nor *Centinela* presumed the existence of a duty or asked whether an exception to the general rule of duty was justified. In *Quelimane,* the Supreme Court applied the *Biakanja* factors and "decline[d] to recognize a duty" in negligence. (*Quelimane, supra,* 19 Cal.4th at p. 58.) In *Centinela,* the Supreme Court examined the *Biakanja* factors and concluded they "support[ed] imposing this continuing common law duty of care" under a negligence theory. (*Centinela, supra,* 1 Cal.5th at p. 1020.)

### B.    Analysis

The negligence allegations in this lawsuit typically invoke the *Biakanja/J'Aire* analysis, where we begin with the first *Biakanja* factor, "the extent to which the transaction was intended to affect the plaintiff." (*Biakanja, supra,* 49 Cal.2d at p. 650.) No appellate authority addressing negligent liability for purely economic loss to third parties has found the existence of a duty of care in the absence of the first factor. (See, e.g., *Centinela, supra,* 1 Cal.5th at p. 1015; *Quelimane, supra,* 19 Cal.4th at p. 58; *Bily, supra,* 3 Cal.4th at pp. 397-398; *J'Aire, supra,* 24 Cal.3d at p. 804; *Biakanja, supra,* 49 Cal.2d at p. 651.)

In the relatively brief time this extraordinary writ petition has been pending, however, business plaintiffs abandoned their

13

earlier allegations that SoCalGas was a party to a contract intended to affect them and now assert their "loss did not arise out of any contract. . . . [There is no contract] relevant to the gas blowout or [their] ensuing losses." Business plaintiffs add, "Indeed, whatever contractual relationships SoCalGas had with other persons are irrelevant to the claims that [business plaintiffs] assert here."

At oral argument, counsel for business plaintiffs relied on Civil Code section 1714's presumption of duty and argued no public policy considerations justify an exception. But Supreme Court authority from *Biakanja* to *Centinela* makes it clear that while duty under circumstances like those in this case may be imposed, it is not presumed.

Business plaintiffs also conflate the "economic loss rule" with the concept of recovery in tort for purely economic loss. As they note, the phrase "economic loss rule" appears in numerous appellate opinions involving contracts, warranties, and products liability; in those decisions, the "economic loss rule" operates as a bar to recovery in the absence of personal injury or property damage. But the Supreme Court did not use that phrase in *Biakanja, J'Aire, Bily, Quelimane*, or *Centinela*. Instead, the analyses in those decisions focus on the existence of a transaction and foreseeability of economic harm to determine whether to impose a duty of care on the defendant vis-à-vis the plaintiff.

Contrary to the assertions by business plaintiffs, a third party's purely economic loss arising from a transaction is a prerequisite for recovery in tort, absent injury to person or property. The failure to establish this foundation precludes a finding of the "special relationship" required by *J'Aire* and subsequent Supreme Court decisions.

14

## IV. The Respondent Court's New Rule for Recovery of Purely Economic Loss in a Mass Tort Action

Presaging—or perhaps serving as a catalyst for—the decision by business plaintiffs to recast the underpinning of their negligence theories, respondent court opined, "the economic loss doctrine . . . currently exists in a state of some uncertainty" as a result of the Supreme Court's treatment in *J'Aire, supra,* 24 Cal.3d at page 807 of an earlier Court of Appeal decision, *Adams v. Southern Pac. Transportation Co.* (1975) 50 Cal.App.3d 37 (*Adams*). In overruling the demurrer, respondent court necessarily found SoCalGas owed a duty as a matter of law to business plaintiffs based on its responsibility to "bear all costs its accident caused."[8] Respondent court did not engage in a *J'Aire* or *Biakanja* analysis, but came to this conclusion by focusing on *Adams* rather than on more recent Supreme Court precedent.

*Adams* predated *J'Aire* by four years. The *Adams* plaintiffs sued a railroad for negligent interference with prospective economic advantage after a cargo of bombs exploded and destroyed the plant where they worked. In affirming the judgment after the defendant's demurrer was sustained, the Court of Appeal determined stare decisis required adherence to

---

[8] The complete context for the court's statement was as follows: "In sum, standard tort theory mandates that [SoCalGas] bear all costs its accident caused. This total should include tangible and conventionally measurable economic losses to neighboring businesses. In this way [SoCalGas] (and everyone else) will face the correct incentive to minimize the social cost of future accidents."

15

the rule in *Fifield Manor v. Finston* (1960) 54 Cal.2d 632
(*Fifield*).[9] (*Adams, supra,* 50 Cal.App.3d at p. 40.)

    *Adams* described the "*Fifield* rule" as "an expression of a
general doctrine prevailing in American courts which bars
recovery for negligent interference with profitable economic
relations." (*Adams, supra,* 50 Cal.App.3d at p. 40, fn. omitted.)
Accordingly, the *Adams* court held Supreme Court precedent
required it to reject the tort of negligent interference with
prospective economic advantage.[10] This is precisely the holding

---

[9]    In *Fifield*, an individual with a "life care" contract was
struck by a car. The plaintiff, the nonprofit entity responsible for
his care under the contract, sued the allegedly negligent driver
for subrogation and interference with contractual relations to
recover the injured individual's medical expenses. (*Fifield, supra,*
54 Cal.2d at p. 634.) *J'Aire* explained it was foreseeable the
negligent driver would injure the victim, but "less foreseeable
that it would injure the retirement home's economic interest."
(*J'Aire, supra,* 24 Cal.3d at p. 807.)

    *Fifield* has not endured as a significant decision in the tort
arena. It is cited more frequently for its subrogation analysis.

[10]    Two of the *Adams* justices then engaged in a philosophical
discussion designed to "illustrate the tangible consequences of the
'new' analysis in probing the outer regions of negligence liability."
(*Adams, supra,* 50 Cal.App.3d at p. 45.) Despite the far-ranging
discussion, the majority in *Adams* "rigorously eschew[ed]" the
"balancing of important and complex policy factors . . . . Although
[the] plaintiffs' loss was a foreseeable result of [the railroad's]
provisionally admitted negligence, [they] neither debate[d] nor
decide[d] whether the railroad owed these plaintiffs a duty of
care." (*Id.* at p. 47.)

    By declining to determine whether a duty existed based on
the facts before it, *Adams* cannot be relied upon to establish

*J'Aire* disapproved: "*Fifield* [unlike *Adams*] does not entirely foreclose recovery for negligent interference with prospective economic advantage." (*J'Aire, supra,* 24 Cal.3d at p. 807.) "To the extent that *Adams* holds that there can be no recovery for negligent interference with prospective economic advantage, it is disapproved." (*Ibid.*)

In other words, *J'Aire* disapproved *Adams* insofar as *Adams* held a plaintiff can never recover purely economic losses based on a defendant's negligent conduct. *J'Aire* cited *Fifield* as an example where a plaintiff could not prevail on negligence theories based on the absence of a special relationship with the defendant and the remoteness of the foreseeability factor: "[The d]efendant had not entered into any relationship or undertaken any activity where negligence on his part was reasonably likely to affect [the] plaintiff adversely. Thus, the nexus between the defendant's conduct and the risk of the injury that occurred to the plaintiff was too tenuous to support the imposition of a duty owing to the retirement home." (*J'Aire, supra,* 24 Cal.3d at p. 807.)

Although the *Adams* justices determined Supreme Court precedent compelled them to reject the negligence theory of the plaintiffs' case and did not engage in a foreseeability or duty analysis, they were all intrigued by the plaintiffs' contention "that *Fifield* and its companion decisions are not [on] point. [They claim the] lawsuit . . . is not cast in terms of interference with employment contracts but alleges physical destruction of the property which enabled them to earn a livelihood. Indeed the

---

defendant's duty of care in this mass tort action involving only economic loss to third parties, i.e., business plaintiffs.

17

argument has substance." (*Adams, supra,* 50 Cal.App.3d at p. 40.)  With the benefit of hindsight, we agree.

This argument carried the day in *George A. Hormel & Co. v. Maez* (1979) 92 Cal.App.3d 963 (*Maez*).  *Maez* was decided after *Adams* and only four months before *J'Aire*.

The defendant in *Maez* was a negligent driver who toppled a power pole, damaging the transformer.  In a *Palsgrafian*[11] chain of events, the downed transformer cut off electricity in the vicinity, which caused a power surge.  The power surge burned out a motor for critical machinery in the plaintiff's nearby facility.  Without the machinery, the plaintiff's employees could not work.  The plaintiff successfully sued for the cost of replacing the motor and the wages it paid idled employees until the motor was replaced.  (*Maez, supra*, 92 Cal.App.3d at p. 966.)  The Court of Appeal affirmed, concluding the plaintiff's damages were reasonably foreseeable and, for that reason, the defendant owed a duty of care.  (*Id.* at p. 971.)

Factually, *Maez* is similar to *Adams*:  Both cases involved businesses forced to shut down as a result of property damage to their premises.  It is without consequence that the plaintiffs in *Adams* were idled and apparently unpaid employees, while the *Maez* plaintiff was the employer that continued to pay the idled employees.  The ultimate difference between the results in the two cases appears to be *Adams's* interpretation of *Fifield*.

This brings us to the Ninth Circuit's opinion in *Union Oil Co. v. Oppen* (9th Cir. 1974) 501 F.2d 558 (*Union Oil*).  *Union Oil* is particularly apt.  There, commercial fishermen sought damages from an oil company for releasing vast quantities of raw crude off

---

11      *Palsgraf v. Long Island R.R. Co.* (1928) 248 N.Y. 339.

18

the coast of Santa Barbara.  (*Id.* at p. 559.)  Sea life perished, i.e., the "property" commercial fishermen depended on for their livelihoods was destroyed.  Commercial fishermen sued for profits lost as the commercial fishing potential was decimated.  The court acknowledged California law generally precluded negligence actions for pure economic losses unless there was "some special relation between the parties."  (*Id.* at pp. 565-566 ["approach adopted by the California Supreme Court in *Biakanja* is particularly instructive"].)  The court also highlighted "the familiar principle that seamen are the favorites of admiralty and their economic interests entitled to the fullest possible legal protection."  (*Id.* at p. 567.)  Ultimately, the court held the plaintiffs' loss of profits was foreseeable and the oil company owed a duty to the commercial fishermen.  (*Id.* at p. 568.)

In permitting the lawsuit to proceed as to the commercial fishermen, the *Union Oil* court warned "it must be understood that our holding in this case does not open the door to claims that may be asserted by those, other than commercial fishermen, whose economic or personal affairs were discommoded by the oil spill . . . .  The [rule we adopt] has a legitimate sphere within which to operate.  Nothing in this opinion is intended to suggest, for example, that every decline in the general commercial activity of every business in the Santa Barbara area following the [oil spill] constitutes a legally cognizable injury for which the [oil company] may be responsible."  (*Union Oil, supra,* 501 F.2d at p. 570.)

The common element in *Adams, Maez,* and *Union Oil* is the "physical destruction of the property which enabled [the plaintiffs] to earn a livelihood."  (*Adams, supra,* 50 Cal.App.3d at p. 40.)  That element is missing here.  Business plaintiffs suffered

19

a decline in commercial activity as a result of neighborhood residents temporarily relocating after the gas leak.  However, in *Union Oil's* words, their economic losses are beyond the "sphere . . . of a legally cognizable injury for which [SoCalGas] may be responsible."  (*Union Oil, supra,* 501 F.2d at p. 570.)

Traditional analyses hold in this case.  California has never recognized an unlimited duty of care.  (*Bily, supra,* 3 Cal.4th at p. 398.)  In the absence of personal injury or property damage, the special relationship requirement serves as a foreseeability gauge.  Without a special relationship, foreseeability is typically too tenuous to support the imposition of a duty of care to a third party.  Foreseeability is always "the key component necessary to establish liability."  (*J'Aire, supra,* 24 Cal.3d at p. 806.)  Moreover, as discussed above, *Bily* tempered *J'Aire* by recognizing that foreseeability alone may not be enough to permit recovery on a negligence theory if the imposition of liability would be "out of proportion to fault or [would] promote virtually unlimited responsibility for intangible injury."  (*Bily, supra,* 3 Cal.4th at p. 398.)

Overruling the demurrer to hold SoCalGas accountable to business plaintiffs for "all the costs its accident caused" would "promote virtually unlimited responsibility."  (*Bily, supra,* 3 Cal.4th at p. 398.)  Without personal injury, property damage or a special relationship, the general rule that precludes business plaintiffs from recovering for pure economic losses under a negligence theory remains viable.

Counsel for business plaintiffs confirmed at oral argument they do not seek leave to further amend their pleading.  (*Centinela, supra,* 1 Cal.5th at p. 1010.)  This position tacitly acknowledges the complaint does not suffer from a deficiency that

20

can be cured by amendment, but is, instead, ripe for writ review: "Where, as here, the pleadings and matters subject to judicial notice establish the defendant owed the plaintiff no duty, a case may properly be disposed of on demurrer, without further waste of judicial resources." (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 165, fn. 12.)

## DISPOSITION

Let a peremptory writ of mandate issue directing the respondent court to vacate its order overruling the demurrer and issue a new order sustaining the demurrer without leave to amend. The temporary stay is vacated. Costs are awarded to petitioner SoCalGas.

DUNNING, J.*

I concur:

KRIEGLER, Acting P. J.

---

* Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In Re Southern California Gas Leak Cases
B283606


BAKER, J., Dissenting


Although I dissent from today's decision, it is not because I believe the trial court's rationale for overruling Southern California Gas Company's demurrer is correct—I agree it is not. But it was a mistake for us to have intervened at this early stage of the case, and that mistake may well have significant consequences on the merits.

In another case involving a utility company, our Supreme Court endorsed the rule that an appeal from a final judgment is "normally presumed to be an adequate remedy at law" for a party who believes it is aggrieved by an erroneous ruling overruling a demurrer. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 912-913 (*San Diego Gas*).) That normally adequate remedy "thus bar[s] immediate review by extraordinary writ." (*Ibid.* [explaining an exception to the bar applies in circumstances not present here, namely, when the demurrer raises an important question of subject-matter jurisdiction].)

Despite this rule, this court issued an alternative writ to review the trial court's demurrer ruling, tentatively concluding the trial court erred in determining "the general prohibition against liability for pure economic loss does not apply in a mass tort action."[1] Today's decision finalizes that tentative conclusion

---

[1] To be fair, the writ issued at the express invitation of the trial court judge, who certified his demurrer ruling under Code of

and holds the trial court's rationale was indeed erroneous. But there is wisdom in the *San Diego Gas* rule, which generally permits erroneous demurrer rulings to stand until final judgment.

Had we declined to intervene now, we would have a more developed record on which to base our decision when confronted with a later appeal or writ petition. And the existence of a more developed record, to my mind, is important to arrive at an appropriate disposition of this case. I think it is quite possible that some—but certainly not all—of the businesses in a five-mile radius from the Aliso Canyon Storage Facility are situated such that Southern California Gas Company owed them a duty of care. In other words, I believe some businesses in the immediate geographic area of the gas leak could have a special dependence on that area such that harm to them would be foreseeable to Southern California Gas Company in a way it would not with respect to many other businesses in the area.[2] (See, e.g., *Union Oil Co. v. Oppen* (9th Cir. 1974) 501 F.2d 558, 568, 570 [determining—on appeal from partial summary judgment—that

---

Civil Procedure section 166.1. But such invitations are not binding, nor are they quite uncommon. (*Bank of America Corp. v. Superior Court* (2011) 198 Cal.App.4th 862, 869, fn. 6 [Code of Civil Procedure section 166.1 permits a trial judge to encourage an appellate court to hear and decide a question but does not change existing writ procedures]; see also, e.g., *Farmers Insurance Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 104-105 [trial judge certifying question]; *Moore v. Kaufman* (2010) 189 Cal.App.4th 604, 613 [same].)

[2] One potential example that comes to mind are food delivery businesses (e.g., Domino's Pizza) unlikely to deliver beyond a limited geographical area.

companies responsible for an oil spill in the Santa Barbara Channel area owed a duty to commercial fishermen in the area "whose economic or personal affairs were discommoded by the oil spill," but not other businesses].)  Indeed, there is reason to believe plaintiff and Real Party in Interest Polonsky Family Day Care is such a business because it would be unusually dependent on customers who work or live in the vicinity of the gas leak.[3] Because the majority's opinion resolves the business plaintiffs' litigation on the demurrer record, however, it has no ability to approach the question of duty with a scalpel, and unfortunately resolves it instead with a meat axe.  (Compare *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1140 [reversing Court of Appeal holding that employer owed no duty of care to avoid take-home asbestos exposure and concluding duty does extend to household members of an employee exposed to asbestos—but not to others who do not live in the employee's household].)

I would discharge this court's alternative writ as improvidently granted.

BAKER, J.

---

[3]     Insofar as the record at this early stage does not firmly establish this is the case, it is either (a) a problem that could be cured by amending the complaint, or (b) an example of a duty question that should not be fully answered until after resolution of factual issues.  (See *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162, fn. 4 [existence and scope of a defendant's duty of care is a legal question for a court, but trier of fact must resolve factual issues that are logically prior to the question of duty].)

3