Filed 11/13/24; Certified for Publication 12/5/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| COUNTY OF LOS ANGELES, | B339093 |
| Petitioner, | (Super. Ct. No. 20STCV24771) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| EVANGELINA HERNANDEZ; A.C., et al., | |
| Real Parties in Interest. | |

 ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Christian R. Gullon, Judge.  Granted in part, denied in part.

 David Weiss Law, David J. Weiss, Jacqueline L. Shulman and Margaret Bryne Ikeda; Pollak, Vida & Barer, Daniel P. Barer, Karen M. Stepanyan for Petitioner.

No appearance for Respondent.

Rees Law Firm and Robert A. Rees; The Claypool Law Firm, Brian E. Claypool, Nathalie Vallejos; Taylor & Ring, David M. Ring and Sonya Ostovar, for Real Parties in Interest.

---

This case arises from the tragic death of four-year-old Noah C., who was removed from and returned to his abusive parents' custody multiple times before dying at their hands in July 2019. Noah's great-grandmother, Evangelina "Eva" Hernandez, in her personal capacity and as successor in interest to Noah's estate and guardian ad litem for his minor siblings A.C., E.C., and R.C., sued the County of Los Angeles (County) and Hathaway-Sycamores Child and Family Services (Hathaway) after Noah's death.

Currently at issue is the second cause of action for negligence Hernandez asserts against the County in her seventh amended complaint (7AC).[1] The trial court overruled the County's demurrer to the cause of action, holding that the County had a mandatory duty under Welfare and Institutions Code section 361.3 (section 361.3) to notify Hernandez about a removal warrant for Noah it obtained but failed to execute. The County filed a petition for writ of mandate seeking to overturn the ruling. This court issued an alternative writ directing the trial court to

---

[1] The County also sought writ relief from the court's overruling of its demurrer to the eighth cause of action for negligence, asserted on behalf of A.C., E.C., and R.C. We denied the requested relief on August 23, 2024; the eighth cause of action is no longer at issue here.

either vacate its order overruling the demurrer and enter a new order sustaining the demurrer on the ground that section 361.3 does not impose a mandatory duty to notify a relative prior to the physical removal of a dependent minor from parental custody, or to show cause why a peremptory writ of mandate should not issue. The trial court declined to vacate its order.

We now hold that section 361.3 does not impose on the County a mandatory duty to notify a relative who requested preferential consideration for placement of an application for a protective custody warrant pursuant to Welfare and Institutions Code section 340 or a court order granting such a warrant prior to the minor's removal from physical parental custody. We further conclude that none of the other provisions invoked by Hernandez in the 7AC—including the California Department of Social Services Manual of Policies and Procedures for Child Welfare Services (Manual), Civil Code section 1714, and the special relationship doctrine—gives rise to a mandatory duty to notify. Additionally, the 7AC does not plead facts supporting the existence of a duty owed to Hernandez by the County or its employees and accordingly does not state a claim for vicarious liability under Government Code section 815.2. We therefore grant the petition as to the second cause of action, vacate the trial court's order overruling the County's demurrer to the second cause of action, and remand the matter to the trial court with directions to enter a new order sustaining the demurrer to the second cause of action without leave to amend.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Allegations

Hernandez makes the following relevant allegations in the 7AC. "Because this case comes to us at the demurrer stage, we

take as true all properly pleaded material facts — but not conclusions of fact or law." (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395.)

During Noah's life, "[t]here were at least a dozen calls made to the child abuse hotline and law enforcement from people who said they suspected Noah and his siblings were being abused." The County Department of Children and Family Services (DCFS) removed Noah from his parents' custody "several times due to neglect at the hands of his parents" and placed him in foster care or with Hernandez. For example, he was removed from his mother's custody when he was six months old, due to a substantiated allegation of child abuse involving another relative. Noah was placed with Hernandez for about six months before he was returned to his parents' care. Hernandez also alleges Noah was in protective custody from August 2014 to May 2015.

On October 4, 2016, allegations that Noah's parents generally neglected and abused him were substantiated. In November 2016, the dependency court again declared Noah a dependent based on allegations he was failing to thrive in his parents' care. The dependency court awarded Hernandez custody of Noah and granted his parents monitored visitation. On August 28, 2017, the court found Noah's parents were making progress toward reunification and liberalized their visitation to unmonitored. The court further liberalized parents' visitation to include unmonitored overnight visits in November 2017.

At a May 29, 2018 review hearing, the dependency court ordered DCFS to provide age-appropriate mental health services to Noah, including conjoint counseling with both his parents. DCFS retained mental health agency Hathaway to provide the court-ordered services. Hernandez alleges that Hathaway

4

negligently provided these services and negligently concluded on October 29, 2018 that Noah lacked any medical necessity for therapy.

Prior to a hearing originally scheduled for November 1, 2018, DCFS recommended that the dependency court terminate family reunification services. Relying on Hathaway's negligent opinion, the dependency court returned Noah to his parents over the objection of DCFS on November 9, 2018. The dependency court ordered that Hernandez have visitation with Noah.

In or about February 2019, a DCFS caseworker noted that Noah, who was then four years old, appeared lethargic and withdrawn. In March and April 2019, DCFS received three more referrals concerning Noah, including a report that Noah arrived at a hospital with bruises on his back. On or about May 13, 2019, "reports were made" that Noah's father "had an alcohol problem and allegedly kicked Noah and his other minor children while out in public." Around the same time, DCFS caseworkers "learned of allegations that Noah had been sodomized and had injuries to his rectum consistent with sexual abuse."

On or about May 15, 2019, DCFS caseworker Susan Johnson filed a 26-page petition or application to remove Noah from his parents' custody.[2] The dependency court granted the

---

[2] Although the record indicates that Hernandez was granted access to the confidential removal order dated May 15, 2019, neither the application for removal nor the removal order appears to have been filed with the 7AC or is in the record in this case. The trial court granted the County's motion to strike paragraph 103 of the 7AC, which included an excerpt cut-and-pasted from the petition, after finding that "the presiding judge of the juvenile court has not approved that any portion of the petition be used in the civil proceeding."

application "authorizing Noah's removal" the same day, "due to probable cause to believe there was 'substantial danger to the safety or to the physical or emotional health of the child' and 'continuance in the home of the parent(s) and/or legal guardian [was] contrary to the child's welfare.'" The order also "mandated a medical and/or sexual abuse examination pursuant to Welfare & Institutions Code section 324.5 and/or Penal Code section 13823.11," stating, "'the exam shall be conducted within 72 hours of this order unless the child requires protective custody, in which case the exam shall be conducted within 72 hours of protective custody.'" DCFS "willfully ignored" the order and no examination took place. Noah remained in his parents' care. DCFS did not notify Hernandez about the application or the order.

On or about June 18, 2019, DCFS prepared a "Structured Decision Making" assessment for Noah, which stated there were "'current concerns for the mother's mental health'" and "indicated that the risk was 'very high.'" Four other assessments "throughout the years" ranked Noah's risk as "high" or "very high." Noah remained with his parents.

On or about July 5, 2019, Noah's parents called 911 and reported that Noah was drowning in a swimming pool. An ambulance rushed Noah to the hospital, where staff found signs of trauma on his body and determined there were issues and irregularities with his parents' explanation of his cause of death. Noah died on or about July 6, 2019. His parents were indicted on murder and torture charges.[3]

---

[3] The County's demurrer to the 7AC, filed April 8, 2024, asserts that on March 29, 2024, Noah's father pled no contest to

6

## II. Second Cause of Action for Negligence

In the second cause of action for negligence, which incorporates and realleges the factual allegations above, Hernandez alleges that DCFS had and breached duties to notify her of dangers facing Noah; to notify her that it applied for, obtained, and failed to execute a warrant to remove Noah from his parents' care; to notify her that its decision not to execute the warrant lacked a factual basis because no DCFS decisionmakers read the warrant or supporting documents; and to train its employees on statutes, regulations, and County policies regarding the provision of information to responsible relatives and interested parties.

Hernandez alleges that "[h]ad DCFS complied with its mandatory duty to notify Ms. Hernandez of the petition for removal order and the issuance of the removal order for Noah, she would have been able to notify the dependency court that DCFS defied executing the removal order and that Noah did not undergo a mandated forensic sexual abuse exam within 72 hours of the date of the removal order."  She alleges DCFS "robbed" her of the opportunity to inform the dependency court of DCFS's decision not to execute the warrant and "hire[ ] an attorney to protect her rights and those of Noah's."  She alleges that had DCFS "fulfilled their duties and responsibilities, decedent Noah C[.] would not have been injured and murdered."

Hernandez alleges that DCFS's duties to her arose from multiple sources.  We summarize these legal conclusions here.

---

first degree murder and torture, and Noah's mother pled no contest to second degree murder and torture.  Hernandez made the same representation to the trial court during the May 17, 2024 hearing on the demurrer.

7

First, Hernandez alleges that the Manual "contains regulations that are binding and to be followed by County." She alleges that among these regulations is "Manual, Div. 31, Handbook, 1514, thru 366.3" [*sic*] (Handbook), which itself contains "Section 361.3 regarding the duty to notify a relative of a dependent child" (Handbook Section 361.3). Handbook Section 361.3, titled "Assessment of Preferential Consideration for Relatives," largely tracks the statutory language of section 361.3, which Hernandez also invokes as a source of mandatory duty and which we will discuss at length below.

Hernandez highlights language in section 361.3 and Handbook Section 361.3 regarding preferential consideration for placement of dependent children with relatives, as well as language stating, "The county social worker shall initially contact the relatives given preferential consideration for placement to determine if they desire the child to be placed with them." Hernandez points to the word "shall" and alleges that she met the criteria to be given preferential consideration. Therefore, she alleges, "County had an obligation to contact Ms. Hernandez of [*sic*] the dependency court's removal order, serving to notify her of the removal order." She further alleges that the Manual and the Welfare and Institutions Code do "not differentiate between a warrant being applied for and granted and a decision to execute the warrant. A removal order equates to a removal and gives rise to the duty to contact Ms. Hernandez."

Hernandez next alleges that the County had a "policy" and "common practice" of "[c]ontacting a relative like Ms. Hernandez," and such policy "is the equivalent of a regulation and is required to be followed." She alleges that a former DCFS social worker, Lizbeth Hernandez Avila, gave deposition

testimony that "That's the norm usually. When there is a warrant being served, we notify parents and if they had a previous placement that they were thriving in."

Hernandez further alleges that Civil Code section 1714 imposed on DCFS a duty "to use reasonable care towards" her, "and this duty required DCFS to notify her about Noah's health and safety, including that DCFS was petitioning the dependency court to remove Noah from his parents because Noah was in danger; that DCFS was seeking an order for a forensic examination of sexual abuse of Noah; and also later that DCFS decided not to execute the removal warrant or obtain the sexual abuse forensic examination." She additionally points to the order granting the application for removal, which she alleges "created a duty for DCFS to notify [Hernandez] because it knew she was the only caregiver that Noah had thrived with, and [Hernandez] would need to know about the petition and be provided with the actual removal order to ensure that Noah was taken to the forensic sexual abuse examination within 72 hours."

Finally, Hernandez alleges DCFS had a "special relationship" with her that required DCFS to notify her "about Noah's safety, and possible sexual abuse of Noah while he was in his parent's [*sic*] custody." She alleges that she was Noah's primary caregiver "for more than half of his entire life," and she "possessed information about Noah unique from his parents." She further alleges that Noah had "'psychologically bonded'" with her and "always preferred to be with [Hernandez] instead of his parents," whom he "always vigorously resisted even visiting." Hernandez alleges DCFS knew the dependency court had granted her visitation rights with Noah, which gave her "a right to participate in court hearings that affected her visitation

9

rights" and "a corollary right to notice of any hearings that affected Noah." She alleges DCFS planned to place Noah with her and knew that she "expected to be notified about Noah's safety, and possible sexual abuse of Noah while he was in his parent's [*sic*] custody," and "its social workers were the only source of information." She alleges that Johnson's failure to check a particular box on the application for removal warrant is "evidence of the duty," and "serves as an admission by DCFS that [Hernandez] was the only relative to be Noah's caregiver and as such should have been notified."

## III. Demurrer Proceedings

### A. Demurrer

The County filed a demurrer, arguing that the second cause of action failed to state a claim because it did not owe any mandatory duties to Hernandez.[4]

The County first contended that section 361.3 did not impose a mandatory duty to notify Hernandez. The County argued that the purpose of section 361.3 "is to find suitable placement for a child in DCFS custody, not to confer on relatives rights to confidential information." It further argued that section 361.3 did not apply, because by its terms it applies only when a child is removed, and here "[t]he warrant was not executed, and Noah was not taken into custody by DCFS in 2019." It asserted that there was no failure to prioritize Hernandez or any other

---

[4] The County also argued that the second cause of action failed due to a lack of causation: "Hernandez cannot draw a causal connection between the alleged failure to advise her about the warrant and Noah's death because no one knows what the Juvenile Dependency Court would have done at a detention hearing following Noah's removal from his parents." The trial court rejected this argument, and it is not at issue here.

prospective caregiver under section 361.3 because Noah "was not removed from his parents between November 2018, when he was reunified with them, and July 5, 2019, when he was killed. Accordingly, . . . section 361.3 cannot serve as the mandatory duty that was breached and resulted in the claimed injury."

Next, the County contended that Handbook Section 361.3—which contains largely the same language as section 361.3—also did not impose a mandatory duty. First, the County argued that Handbook Section 361.3 does not include great-grandparents among the relatives entitled to preferential consideration for placement. Second, the County argued that only certain portions of the Manual qualify as mandatory regulations, and Handbook Section 361.3 is not among them.

The County disputed Hernandez's allegations that there was a special relationship between DCFS and Hernandez that gave rise to a duty to notify her. In addition to asserting that the trial court sustained two previous demurrers due to inadequate allegations of a special relationship, the County argued that no special relationship could exist between Hernandez and the County as a matter of law. It argued that "only a special relationship between the tortfeasor and the victim of third-party acts (Noah) or the third-party attacker (the parents) can create a special relationship giving rise to a duty to protect or warn." The County additionally argued that the absence of a special relationship or mandatory duty precluded the application of Civil Code section 1714. It also asserted that confidentiality laws governing dependency proceedings prohibited the disclosure of information to Hernandez, who, despite her visitation rights, was not Noah's legal guardian, a party to the dependency

11

proceedings, or otherwise entitled to notice of the hearing under Welfare and Institutions Code sections 290.1 and 290.2.

## B.    Opposition and Reply

Hernandez opposed the demurrer.  She argued that section 361.3 and the Manual required DCFS to make "initial contact" with her.  She further contended that the "statute about preferential treatment is . . . irrelevant when DCFS has unanimously concluded that Noah would be placed with [Hernandez] upon removal given [her] significant history with Noah. [Hernandez] had preferential consideration in the eyes of DCFS and should have been treated as such by being contacted by DCFS."  Hernandez asserted that the County's arguments about the purpose of section 361.3 also were irrelevant "on several fronts."  First, the duty at issue was to notify her of the warrant, "not to disclose confidential information" to her. Second, "throughout Noah's life, DCFS was disclosing confidential information to [Hernandez] about Noah. Lastly, the Court itself found this to be an impractical application of the regulation as contact about whether [Hernandez] would take Noah would *tacitly* require communication about the removal order." Hernandez additionally rejected the County's argument that Handbook Section 361.3 was not a regulation.

Hernandez contended that the County's argument regarding Civil Code section 1714 was "irrelevant," because that statute "can establish vicariously [*sic*] liability under Govt Code § 815.2 and . . . the Court has specifically permitted these allegations."  She also argued that the trial court had permitted her to allege a special relationship, which was "highly fact dependent" and "cannot be resolved at the pleading stage where the parties do not have all the facts."  Additionally, she asserted

12

that the County's arguments about confidentiality were "nonsensical" because the second cause of action was based on the County's failure to contact her "with the information the County was compelled by law to share" with her, the County had shared information with her in the past, and the County had not identified any authority prohibiting it from contacting her about the removal warrant1.

In its reply, the County primarily reiterated the arguments asserted in the demurrer. It additionally asserted that "in May 2019, there was not even a discretionary duty to involve Hernandez in decisions about Noah's possible removal because the warrant was never exercised. A decision not to execute the warrant issued May 15, 2019 was also discretionary and did not violate any state or DCFS policy or procedure adopted as a regulation."

### C.    Hearing

At the hearing on the demurrer, the County argued that section 361.3 and Handbook Section 361.3 could not give rise to a mandatory duty to notify Hernandez because they "expressly apply only after a child is removed from his parents' physical custody," and the 7AC "specifically alleges Noah was not removed from his parents' physical custody." It further asserted that Hernandez did not have a special relationship with the County and had not pointed to any statute or regulation "that imposes a mandatory duty on the County to inform any relative when DCFS is petitioning the court to remove a child as opposed to when the child is actually removed from his parents' physical custody."

The County further argued that "[e]verything having to do with the warrant, the decision to apply for a warrant, is

13

discretionary. The decision not to execute a warrant or whether to execute a warrant is discretionary. . . . Because it was done through the exercise of discretion, it cannot support the existence of a mandatory duty, and Ms. Hernandez cannot state a valid cause of action." The County asserted that "a removal warrant "is not an order for removal. It is an authorization for removal. And that order has a duration of ten days, so that the County specifically can conduct continuing investigations to determine whether an exercising of the warrant, which is a significant thing to do to a child, continues to be appropriate."

The County continued, "It is an authorization for removal based on a finding by the court that there is evidence that the child is in [*sic*] risk of harm if not removed." It contrasted this with the portion of the order requiring the forensic exam, which the County acknowledged was mandatory but "was not followed." It then read the following language from the order into the record: "'A protective custody warrant is issued for the child named above pursuant to WIC 340, subdivision (b). DCFS is authorized to remove the child named above and the child shall be detained from his or her' – with check boxes – 'mother, father, legal guardian, pending Welfare and Institution Code [*sic*] section 319 hearing, unless upon further investigation, mandated pursuant to WIC 340 subdivision (c), DCFS determines that services could be put in place to maintain the child's safety in his home pending . . . hearing."

In response, Hernandez argued that "this removal order was not discretionary." Hernandez asserted that the order "stated that Noah shall – the word shall was used – be subjected to a forensic sexual exam within 72 hours of the date of that removal order," and he "needed to be removed to be subjected to a

14

forensic sexual abuse exam." She asserted that it was "illogical" to "parse out parts of that removal order that are discretionary and parts that are not discretionary." Hernandez further asserted that the Manual used the language "upon a removal order,"[5] which "doesn't mean the child has to be removed" before the County is required to contact relatives given preferential consideration for placement. She also argued that the dependency court already had jurisdiction over Noah at the time the application for removal warrant was made, and "that's not the same as making a discretionary decision whether to interfere with the parents' custody rights" in the first instance. Hernandez also asserted that deposition testimony had revealed that no DCFS supervisors "looked at the application for the removal order that Susan Johnson prepared" or "read the removal order," indicating that no discretion was exercised.

### D.    Ruling

On May 30, 2024, approximately two weeks after the hearing, the court issued a written order overruling the demurrer. The court focused its analysis on the order the dependency court issued on May 15, 2019; aside from the portion read into the record at the demurrer hearing, this order is not in the appellate record.

The court found that the "plain language of the dependency court order is unambiguous." It "signals that DCFS has the authority to remove Noah and that Noah shall be detained from his parents . . . unless the County determines, based upon the forensic examination results, that Noah can safely remain with his parents. . . ." Because DCFS did not conduct the forensic

---

[5]    This language appears in a different provision in the Manual, not in Handbook section 361.3.

examination, the court reasoned, there was no determination that Noah could safely reside with his parents, and therefore he was required to be removed and detained.  The court further concluded that the order "was not merely giving the County authorization/permission to at some random point in time on some random date under some random situation to remove Noah.  Instead, [the dependency court] crafted a *specific* order based upon a *specific* request when DCFS petitioned the dependency court to remove Noah from his parents because Noah was in danger."  Accordingly, the order "can readily be interpreted as an official *approval* of DCFS removing Noah because the examination results would have shown sexual assault."

The court further concluded that the County "misconstrues what it means to exercise discretion."  It found that because no DCFS supervisors read the application or order, "no discretion was used."  Citing factual allegations from the 7AC regarding DCFS's alleged awareness that Noah had been sodomized, the court continued, "had the County done what it was *mandated* to do—submit Noah to a forensic sexual abuse exam—the results *would have* revealed that *no* safety measures could keep Noah with his parents because Noah *was* sexually abused by his father."  Therefore, DCFS "*had to* detain and remove Noah," which would have triggered section 361.3.  And under that statute, Hernandez, "as a relative given preferential consideration, *must* have been notified of the removal.  Had [Hernandez] been notified, as she alleges, she would have taken whatever action necessary to ensure Noah's safety.  And, most importantly, had Noah been placed with [Hernandez], he would have been here today."  The court thus concluded Hernandez "has

16

sufficiently pled that the County breached the mandatory duty owed to her under WIC section 361.3."

The court briefly addressed some of the County's other arguments. Regarding confidentiality, it concluded that both section 361.3 and Handbook Section 361.3 "allow for the disclosure of details regarding the minor's removal," such that "this argument fails to defeat the sufficiency of the pleading." The court further concluded that the County "too narrowly reads the section of the Manual" containing Handbook Section 361.3. The court found that although Handbook Section 361.3 does not list great-grandparents as relatives entitled to preferential consideration, it still required DCFS to contact Hernandez because she was a relative. It also noted that section 361.3 does include great-grandparents, and "[i]f there is a conflict between a statute and a regulation, the statute prevails." The court concluded that it "need not address whether there is a special relationship" between the County and Hernandez, and further concluded that the argument regarding Civil Code section 1714 was moot in light of its determination "that a mandatory duty exists via regulation and statute."

## IV. Writ Proceedings

On July 5, 2024, the County petitioned this court for a peremptory writ of mandate directing the trial court to sustain the demurrer to the second cause of action. The County argued that writ review was appropriate because the matter presented a first-impression question of whether the County owed Hernandez a mandatory duty, the second cause of action would "greatly expand the County's potential exposure," and the trial court's order was "both clearly erroneous as a matter of law and substantially prejudice[d] the petitioner's case . . . in a manner

17

that cannot be corrected on appeal." Substantively, the County argued that it could only be held liable for decisions relating to child placement if they violated a mandatory duty, and neither section 361.3 nor any other provision imposed such a duty.

Hernandez, as the real party in interest, filed a preliminary opposition to the writ petition. She argued that the petition should be summarily denied because the issues presented were not dispositive, the County had an adequate remedy at law, and granting writ review would cause "piecemeal litigation." The County filed a reply urging writ review and disputing Hernandez's contentions.

On August 23, 2024, a panel of this court issued an alternative writ directing the trial court to either "(a) after notice to the parties and an opportunity to be heard pursuant to *Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1250, fn. 10, vacate the May 30, 2024 order overruling petitioner's demurrer only to the second cause of action in the seventh amended complaint, and issue a new order sustaining the demurrer to the second cause of action on the ground that Welfare and Institutions Code section 361.3, subdivision (a) does not impose a mandatory duty on petitioner or its agents to notify a relative (who requested preferential consideration for placement) of the application for a protective custody warrant pursuant to Welfare and Institutions Code section 340 or a court order granting such a warrant before a dependent minor is removed from the physical custody of his or her or their parents;" or (b) show cause before this court on October 10, 2024 why a peremptory writ of mandate should not issue on the ground that petitioner has demonstrated entitlement to relief.

18

The trial court did not vacate the order or issue a new order sustaining the demurrer to the second cause of action. Counsel for Hernandez and the County filed additional briefing and appeared before this court on October 10, 2024.

## DISCUSSION

### I. Propriety of Writ Review

"Even though a trial court's order overruling a demurrer is subject to review on appeal from the final judgment, an appellate court has the option to review such an order prior to final judgment through a writ of mandate." (*California Dept. of Tax & Fee Administration v. Superior Court* (2020) 48 Cal.App.5th 922, 929.) An appeal is presumed to be an adequate remedy at law, but writ review may be appropriate where the remedy by appeal would in fact be inadequate, where the writ presents a significant issue of law or an issue of widespread or public interest, or where resolution of the issue would result in a final disposition as to the petitioner. (*Ibid.*; *County of San Bernardino v. Superior Court (The Red Brennan Group)* (2022) 77 Cal.App.5th 1100, 1106 (*Red Brennan*).) Here, we agree with the County that this matter presents a significant issue of law: whether the County has a duty to notify a relative of an application for a protective custody warrant pursuant to Welfare and Institutions Code section 340 or a court order granting such a warrant before a dependent minor is removed from the physical custody of his or her or their parents. We accordingly grant review.

### II. Standard of Review

Our review of the trial court's order overruling the demurrer is de novo. (*Red Brennan, supra*, 77 Cal.App.5th at p. 1107.) We ask whether the operative complaint states facts sufficient to state a cause of action and, if so, whether it also

19

discloses a defense or other bar to recovery.  (*California Dept. of Tax & Fee Administration v. Superior Court, supra*, 48 Cal.App.5th at p. 929.)  In undertaking this inquiry, we accept all properly pled material facts as true.  (*Ibid.*)  "'If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer.'"  (*Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587, 605.)

## III.    Principles Governing Public Entity Liability

"Under the California Government Claims Act, all government tort liability must be based on statute."  (*Red Brennan, supra*, 77 Cal.App.5th at p. 1107, citing Gov. Code, § 810 et seq.)  This fundamental principle is enshrined in Government Code section 815, which "establishes that public entity tort liability is exclusively statutory."  (*C.A. v. William S. Hart High School Dist.* (2012) 53 Cal.4th 861, 868; see also *id.* at p. 872 ["public entity liability is statutory in nature"].)  The relevant statutory basis for direct public entity liability is Government Code section 815.6, which provides, "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  (Gov. Code, § 815.6.)

Government Code section 815.6 "has three elements that must be satisfied to impose public entity liability: (1) a mandatory duty was imposed on the public entity by an enactment; (2) the enactment was designed to protect against the particular kind of injury allegedly suffered; and (3) the breach of

20

the mandatory duty proximately caused the injury." (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 179 (*B.H.*).) The Government Code defines an "enactment" as "a constitutional provision, statute, charter provision, ordinance, or regulation." (Gov. Code, § 810.6.) Provisions in the Manual adopted pursuant to Welfare and Institutions Code section 16501 and the Administrative Procedures Act may qualify as enactments. (*Thompson v. County of Los Angeles* (2022) 85 Cal.App.5th 376, 380 (*Thompson*); see also *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 145 [regulations in the Manual "have the force of law"].)

"Liability under Government Code section 815.6 may only be based on an enactment that creates an obligatory duty and may not be based on a discretionary or permissive duty." (*Thompson, supra*, 85 Cal.App.5th at p. 380.) "It is not enough that an enactment requires a public entity or officer to perform a function if the function itself involves the exercise of discretion." (*Ibid.*; *B.H., supra*, 62 Cal.4th at p. 180.) Courts have construed this requirement "rather strictly, finding a mandatory duty only if the enactment 'affirmatively imposes the duty and provides implementing guidelines.'" (*Guzman v. Count of Monterey* (2009) 46 Cal.4th 887, 898 (*Guzman*).)

A plaintiff must allege a breach of a mandatory duty to impose direct liability on a public entity under Government Code section 815.6. (See *Thompson, supra*, 85 Cal.App.5th at p. 380; *Searcy v. Hemet Unified School District* (1986) 177 Cal.App.3d 792, 802 ["to state a cause of action every fact essential to the existence of statutory liability must be pleaded with particularity, including the existence of a statutory duty"].) "Duty cannot be alleged by simply stating 'defendant had a duty

under the law'; that is a conclusion of law, not an allegation of fact.  The facts showing the existence of the claimed duty must be alleged."  (*Searcy*, *supra*, 177 Cal.App.3d at p. 802.)  "Since the duty of a governmental agency can only be created by statute or 'enactment,' the statute or 'enactment' claimed to establish the duty must at the very least be identified."  (*Ibid*.)  ""Whether a particular statute is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts."  [Citations.] We examine the "language, function and apparent purpose" of each cited enactment "to determine if any or each creates a mandatory duty designed to protect against" the injury allegedly suffered by plaintiff.'"  (*B.H.*, *supra*, 62 Cal.4th at pp. 180-181, quoting *Guzman*, *supra*, 46 Cal.4th at p. 898.)

A public entity may also have vicarious liability under Government Code section 815.2.  That statute provides that a "public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."  (Gov. Code, § 815.2, subd. (a).) The vicarious liability created by Government Code section 815.2 "is a primary basis for liability on the part of a public entity, and flows from the responsibility of such an entity for the acts of its employees under the principle of respondeat superior."  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.)  Public employees generally are liable for injury caused by their own acts or omissions to the same extent as private citizens (Gov. Code, § 820, subd. (a)), and the public employer is vicariously liable unless the employee is immune from liability (Gov. Code, § 815.2,

22

subd. (b)). (See *Tom Jones Enterprises, Ltd. v. County of Los Angeles* (2013) 212 Cal.App.4th 1283, 1291.) The existence and extent of the public employer's vicarious liability is determined by the scope of the duty legally attributed to its employees. (*Torsiello v. Oakland Unified School District* (1987) 197 Cal.App.3d 41, 45.) "Whether a duty exists is a question of law to be resolved by the court." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).)

## IV. Analysis

As summarized above, the 7AC identifies several putative bases for a duty owed to Hernandez by the County: section 361.3; Handbook Section 361.3; County policy; Civil Code section 1714; the special relationship doctrine; the County's plans to place Noah with Hernandez; a check box on the application for removal warrant; and Hernandez's visitation rights with Noah.[6] We conclude that none of these provisions or facts imposed a duty on the County to notify Hernandez of the warrant proceedings concerning Noah.

### A. Section 361.3

At all times relevant in this case[7], section 361.3 provided, "*In any case in which a child is removed from the physical custody*

---

[6] Notably, the 7AC does not invoke any of the several statutory provisions expressly requiring social services to provide notice of certain dependency proceedings to enumerated parties. (See Welf. & Inst. Code, §§ 290.1-297.) None of those provisions refers to applications for removal warrants or requires notice be given to great-grandparents or previous caregivers.

[7] Section 361.3 was amended effective September 27, 2024. (See Stats. 2024, c. 656, § 16.) Revisions included the addition of subdivision (g), which concerns placement of an Indian child, and

23

*of his or her parents* pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative, regardless of the relative's immigration status." (Former § 361.3, subd. (a) [effective January 1, 2018 through September 26, 2024], emphasis added.)  It further provided, "The county social worker shall initially contact the relatives given preferential consideration for placement to determine if they desire the child to be placed with them.  Those desiring placement shall be assessed according to the factors enumerated in this subdivision. . . .  The court shall authorize the county social worker, while assessing these relatives for the possibility of placement, to disclose to the relative, as appropriate, the fact that the child is in custody, the alleged reasons for the custody, and the projected likely date for the child's return home or placement for adoption or legal guardianship." (Former § 361.3, subd. (a)(8)(B).)  It defined "relative" as "an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons even if the marriage was terminated by death or dissolution." (Former § 361.3, subd. (c)(2).)  Preferential consideration "means that the relative seeking placement shall be the first placement to be considered and investigated." (Former § 361.3, subd. (c)(1).)  The statute did not "guarantee that the child will be placed with any person so identified." (Former § 361.3, subd. (a)(8)(B).)

---

stylistic changes such as replacing the phrases "his or hers" and "him or her" with, respectively, their and them. None of the revisions affects the analysis here.

24

The County contends that the first sentence of the statute establishes that it does not apply to the facts alleged in the second cause of action and 7AC generally. We agree. Section 361.3 governs placement of a child "[i]n any case in which a child is removed from the physical custody of his or her parents." It applies "when a child is taken from [his or] her parents and placed outside the home pending the determination whether reunification is possible," or "whenever a child must be moved" from one placement to another. (*In re A.K.* (2017) 12 Cal.App.5th 492, 498.) "The correct application of the relative placement preference places the relative 'at the head of the line when the court is determining which placement is in the child's best interests.'" (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033.)

The gravamen of the second cause of action is that Noah was *not* removed from his parents. There are no allegations in the 7AC that Noah was removed from his parents or moved from one placement to another pursuant to the May 15, 2019 application or order. Absent a removal of a child from the physical custody of his or her parents, section 361.3 does not apply. It therefore cannot give rise to a mandatory duty here, regardless of how its remaining language is interpreted.

Hernandez argues that the County "makes an extraordinarily tortured interpretation of Welf. and Inst. § 361.3." She asserts that although the statute expresses "a legislative preference that *after* a child is removed, her [*sic*] or she should be placed with a relative," it does "*not* require the child to be removed before the social worker begins the assessment of a future caretaker." She contends it is "absurd" and "makes no sense to take a child into custody before determining whether the

25

potential new custodian is willing to accept the placement," because "[s]ocial workers would have to place the removed child in some interim 'holding area' before and during the assessment."

Hernandez does not cite any authority in support of these arguments, and they are not persuasive. The plain language of section 361.3 provides that relatives are given preferential consideration for placement when "a child is removed from the physical custody of his or her parents." The expression of legislative intent set forth in Welfare and Institutions Code section 16000, subdivision (a) mirrors this unambiguous language, stating, "It is the intent of the Legislature to preserve and strengthen a child's family ties whenever possible. . . . If a child is removed from the physical custody of his or her parents, preferential consideration shall be given whenever possible to the placement of the child with relatives. . . ." (Welf. & Inst. Code, § 16000, subd. (a).) The 7AC does not allege Noah was removed.

Hernandez correctly observes that the plain language of section 361.3 does not specify when the "social worker shall initially contact the relatives." In light of the statute's express requirement that the child be removed from the custody of their parents, the most reasonable interpretation is that this contact also should occur after removal.[8] This interpretation also aligns

---

[8] We note that Welfare and Institutions Code section 309 provides, "*Upon delivery to the social worker* of a child who has been taken into temporary custody under this article, the social worker shall immediately investigate the circumstances of the child and the facts surrounding the child's being taken into custody and attempt to maintain the child with the child's family through the provision of services." (Welf. & Inst., § 309, subd. (a), emphasis added.) It further provides, "*If the child is removed*, the

with the "strong public policy of confidentiality of juvenile records" (*J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329, 1337) and the Legislature's expressed "belief that juvenile court records, in general, should be confidential" (Welf. & Inst. Code, § 827, subd. (b)(1)). Indeed, the confidentiality provision cited by the County, Welfare and Institutions Code section 827, provides that "information relating to the content of the juvenile case file, may not be disseminated by the receiving agencies to a person or agency, other than a person or agency authorized to receive documents pursuant to this section." (Welf. & Inst. Code, § 827, subd. (a)(4).) Neither former caregivers nor relatives including great-grandparents are included among the list of persons authorized to receive such information. (See *id.,* subd. (a)(1).)

However, to the extent the statute may permit pre-removal contact of relatives, it does not require it. It therefore does not impose a mandatory duty on the County. "'To construe a statue as imposing a mandatory duty on a public entity, "the mandatory nature of the duty must be phrased in explicit and forceful language." [Citation.] "It is not enough that some statute contains mandatory language. In order to recover plaintiffs have to show that there is some *specific* statutory mandate that was violated by the [public entity]. . . .'" (*Guzman, supra*, 46 Cal.4th at pp. 910-911.) Section 361.3 does not meet this standard.

---

social worker shall conduct, within 30 days, an investigation in order to identify and locate all adult relatives of the child" and notify them of the removal and "[a]n explanation of the various options to participate in the care and placement of the child and support for the child's family. . . ." (Welf. & Inst. Code, § 309, subd. (e)(1), emphasis added.)

To avoid the conclusion that section 361.3 only applies when a child is removed, Hernandez alleges that the dependency court's May 15, 2019 "removal order equates to a removal and gives rise to the duty to contact Ms. Hernandez." This allegation is a conclusion of law, which we disregard when ruling on a demurrer. (*Southern California Gas Leak Cases*, *supra*, 7 Cal.5th at p. 395.) Moreover, it is unsupported by any authority or the text of the order at issue as read into the record at the demurrer hearing. As read into the record, the order provided that "DCFS is authorized to remove the child named above and the child shall be detained from his or her . . . mother, father, legal guardian, pending Welfare and Institution Code [*sic*] section 319, unless upon further investigation, mandated pursuant to WIC 340 subdivision (c), DCFS determines that services could be put in place to maintain the child's safety in his home pending . . . hearing." An authorization to remove a child unless further investigation reveals there is no need to do so is not a mandate to remove a child. (See *B.H.*, *supra*, 62 Cal.4th at pp. 191-192 ["the decisions of child welfare agency employees—regarding determinations of child abuse, the potential risk to a child, placement of a child, removal of a child, and other resultant actions—are subjective *discretionary* ones that are incidental to the employees' investigations"].) Even if it were, the 7AC provides no factual allegations from which to conclude that a mandate to remove a child is equivalent to the physical removal of the child.

For all these reasons, we conclude section 361.3 does not give rise to a mandatory duty to notify a relative who requested preferential consideration for placement of an application for a protective custody warrant pursuant to Welfare and Institutions

28

Code section 340 or a court order granting such a warrant prior to the minor's removal from physical parental custody.

## B.    Handbook Section 361.3

In the 7AC, Hernandez alleges that Handbook Section 361.3 independently requires the County to notify a caregiver about an anticipated removal.  Like section 361.3, that provision begins,[9] "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative."  It also provides, "The county social worker shall initially contact the relatives given preferential consideration for placement to determine if they desire the child to be placed with them."  Unlike section 361.3, it limits the universe of relatives given preferential consideration for placement to "an adult who is a grandparent, aunt, uncle, or sibling."

The County acknowledges that provisions in the Manual can qualify as enactments and therefore give rise to mandatory duties.  It argues that this particular provision does not qualify as an enactment, however, because it is part of the Handbook rather than the Manual, and the Handbook has not been adopted as regulations pursuant to the Administrative Procedures Act.  Hernandez contends Handbook Section 361.3 is a mandatory regulation.

_____

[9]    The 7AC alleges the provision begins, "Where the court has ordered removal of a child from the physical custody of his or her parents pursuant to section 361, the court shall consider whether the family ties and best interest of the minor will be served by granting visitation rights to the minor's grandparents."  As previously noted, that language is contained in Handbook Section 361.2, subdivision (f), not Handbook Section 361.3.

The distinction, if any, between the Handbook and the Manual is unclear. However, even if we assume for purposes of this opinion that Handbook Section 361.3 is an enactment that can give rise to a mandatory duty, we conclude it does not give rise to any such duty here. The pertinent language in Handbook Section 361.3 is identical to the pertinent language in section 361.3. It therefore fails to give rise to a mandatory duty for the exact same reasons as section 361.3 does.

### C.  County Policy and Civil Code Section 1714

The 7AC alleges that the County had a policy of contacting relatives "like Ms. Hernandez" who previously had custody of a child before removal of the child and "a policy created by a public entity is the equivalent of a regulation and is required to be followed." According to the 7AC, the policy was a "norm" pursuant to which the County notified parents and any "previous placement that they [the child] were thriving in" "[w]hen there is a warrant being served." The County argues that "an agency's internal policy cannot impose a mandatory duty upon a public agency unless formally adopted as a regulation under the Administrative Procedures Act."

Regardless of whether the policy was formally adopted as a regulation, the facts alleged in the 7AC do not support its application. The 7AC alleges that the warrant was never served or executed. Yet the policy cited provides for notification of a child's previous placement "[w]hen there is a warrant being served." As no warrant was served, there would be no basis to apply the policy. The 7AC's assertion that Hernandez "should have been notified of the application for removal" is a conclusion of law that does not establish the existence of a duty for the purposes of a demurrer.

30

Hernandez also argues that the policy "sets a standard of care under [Civil Code] § 1714," and "[v]iolation of a department policy is evidence of negligence and raises a fact issue." Civil Code section 1714 states that "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." (Civ. Code, § 1714, subd. (a).) The Supreme Court has explained that this statute "establishes the default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.'" (*Brown*, *supra*, 11 Cal.5th at p. 214.)

The 7AC alleges that Civil Code section 1714 imposed on the County a duty to use reasonable care toward Hernandez, which required it "to notify her about Noah's health and safety, including that DCFS was petitioning the dependency court to remove Noah from his parents because Noah was in danger; that DCFS was seeking an order for a forensic examination of sexual abuse of Noah; and also later that DCFS decided not to execute the removal warrant or obtain the sexual abuse forensic examination." The County argues that "the general duty under section 1714 alone does not impose a duty to warn a person of potential injury to another person," and that any employees involved were immune from liability under Government Code section 820.2 because their actions were discretionary. Hernandez responds that "Section 1714 can support vicariously [*sic*] liability under Govt Code § 815.2," and "[n]othing in law or logic" supports the County's suggestion "that any § 1714 liability

is inherently precluded by discretionary immunity under Govt. Code § 820.2."

We need not reach the question of immunity because we find no duty. (See *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 201-202 ["the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity"].) Civil Code section 1714 "standing alone, fails to provide the requisite statutory basis for public entity liability required by Government Code sections 815 and 815.6." (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1182.) It may, however, support liability under Government Code section 815.2 if it imposes a duty of care upon the public entity's employees— who need not be specifically identified in the complaint. (See *County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 644.)

Civil Code section 1714 "states a broad rule, but it has limits." (*Brown, supra,* 11 Cal.5th at p. 214.) It imposes a general duty of care on a defendant "only when it is the defendant who has '"created a risk"' of harm to the plaintiff, including when '"the defendant is responsible for making the plaintiff's position worse."'" (*Ibid.*) "The law does not impose the same duty on a defendant who did not contribute to the risk that the plaintiff would suffer the harm alleged. Generally, the 'person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another' from that peril." (*Ibid.*)

Here, the primary harm alleged is Noah's suffering and death at the hands of his parents. The 7AC alleges that "DCFS

32

could easily foresee that leaving Noah in a dangerous situation would lead to significant harm, *which it did for Noah*, whose death was closely connected to DCFS' failure to notify" Hernandez of the application for removal and removal warrant." It further alleges that Hernandez "would have informed the dependency court and hired an attorney to protect her rights and those of Noah's [*sic*]," and "decedent Noah C[.] would not have been injured and murdered." These allegations do not allege a risk to Hernandez or impose upon the County a duty to notify her of confidential proceedings. To the extent the 7AC alleges that Hernandez suffered the loss "of the life-long love, companionship, comfort, society, and care of Noah C[.], protection, affection, moral support, [and] guidance," this peril was created by Noah's parents. The County thus did not have a duty to Hernandez under section 1714 unless an exception to the general rule applied. (See *Brown*, *supra*, 11 Cal.5th at p. 215.) The exception invoked here, the special relationship doctrine, is addressed below.

### D. Special Relationship

The general rule is that a person or entity owes no duty to control the conduct of another person or entity, nor to warn those endangered by such conduct. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129 (*Zelig*).) "In most instances, these general rules bar recovery when plaintiffs, having suffered injury from third parties who were engaged in criminal activities, claim that their injuries could have been prevented by timely assistance from a law enforcement officer." (*Ibid.*) However, "[i]n a case involving harm caused by a third party, a person may have a duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim

33

or the person who created the harm." (*Brown*, *supra*, 11 Cal.5th at p. 215.) "A special relationship between the defendant and the victim is one that 'gives the victim the right to expect' protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.'" (*Id.* at p. 216.) "Relationships between parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests, are all examples of special relationships that give rise to a duty to protect." (*Ibid.*)

In the 7AC, Hernandez alleges DCFS had a special relationship with her that required it to notify her "about Noah's safety, and possible sexual abuse of Noah while he was in his parent's [*sic*] custody." She alleges she was a victim who had a right to expect protection from DCFS. The County does not dispute Hernandez's premise that a special relationship may give rise to vicarious public entity liability. It argues that "Hernandez was not the victim; Noah was."

To the extent Hernandez's mere allegation of a special relationship amounts to something other than a conclusion of a law, we agree with the County that Noah was the victim in a special relationship with the County. Hernandez's arguments here underscore Noah's status as the victim. She asserts that "DCFS could easily foresee that leaving Noah in a dangerous situation would lead to significant harm, which it did." Noah tragically suffered harm, abuse, and death at his parents' hands; Hernandez did not. Hernandez also asserts that her special relationship with DCFS "includ[ed] her visitation rights"—with Noah—and her "duties as the caregiver"—of Noah. While her visitation rights may evince a beneficial relationship between her

34

and Noah (see Welf. & Inst. Code, § 361.2, subd. (i)), Hernandez does not cite any authority to support the argument that these facts establish a special relationship between her and the County.

### E. Other Alleged Sources of Duty

The 7AC alleges that Hernandez's visitation rights, the County's plans to place Noah with her upon any removal, and its failure to check a box on the removal application all independently gave rise to a duty to notify Hernandez of the application for removal warrant and the proceedings thereon. Hernandez appears to have abandoned the checkbox argument; it is not mentioned in her return. Her allegations related to visitation rights and desire for preferential consideration for placement are subsumed within other alleged duties already discussed, namely those imposed under section 361.3, Handbook Section 361.3, and the special relationship doctrine. We need not and do not discuss them further here.

### DISPOSITION

The petition for extraordinary writ is granted in part. Let a writ of mandate issue directing the superior court to vacate its May 30, 2024, order to the extent it overrules the demurrer to the second cause of action in the seventh amended complaint. The court shall issue a new and different order sustaining the demurrer to the second cause of action without leave to amend. In all other respects, the petition for extraordinary writ is denied. The County of Los Angeles is awarded their costs.

COLLINS, J.

We concur:

CURREY, P. J.                              ZUKIN, J.

Filed 12/5/24

**CERTIFIED FOR PUBLICATION**
IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION FOUR

| | |
|---|---|
| COUNTY OF LOS ANGELES,<br><br>    Petitioner,<br><br><br>    v.<br><br><br>THE SUPERIOR COURT OF<br>LOS ANGELES COUNTY,<br><br>    Respondent;<br><br><br>EVANGELINA HERNANDEZ;<br>A.C., et al.,<br><br>    Real Parties in Interest. | B339093<br><br><br>(Los Angeles County<br> Super. Ct. No.<br> 20STCV24771)<br><br><br>ORDER CERTIFYING<br>OPINION FOR<br>PUBLICATION |

THE COURT*

    The opinion in the above-entitled matter filed on November 13, 2024 was not certified for publication in the Official Reports. Upon application of Petitioner County of Los Angeles and for good cause appearing, it is ordered that the opinion shall be published in the Official Reports.

Pursuant to California Rules of Court, rule 8.1105(b), this opinion is certified for publication.

---

*CURREY, P. J.   COLLINS, J.

ZUKIN, J.